

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

              CR. NO. 05-1647 BB

JUAN PEDRO PAYAN-VARGAS,

    Defendant.

05 OCT 19  AM 10: 45

CLERK-ALBUQUERQUE

## DEFENDANT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

COMES NOW Defendant, JUAN PEDRO PAYAN-VARGAS, by and through his

attorney, Felipe D.J. Millan, and submits the following Proposed Findings of Fact and

Conclusions of Law.

### PROPOSED FINDINGS OF FACT

1.     Detective Jaime Quezada is currently working for the U.S. Marshal's Fugitive

Task Force and the Targeting Neighborhood Threats Unit for the Las Cruces Police

Department. His duty is to enforce state warrants. Tr. at 5.

2.     Detective Quezada received information from the adult probation and parole

office of a fugitive named Fidel Gonzalez. Such information was received in a contact sheet.

3.     As part of Detective Quezada's work he was asked to enforce a valid warrant

issued by the district court against Mr. Fidel Gonzalez. Tr. at 6.

1

**ORIGINAL**

4.    The contact sheet received by Detective Quezada contained identification information about Mr. Fidel Gonzalez. Such information included Mr. Fidel Gonzalez' physique, photographs and current address.  Tr. at 7, 8.

5.    On April 19, 2005, Detective Quezada, assisted by four other officers, went to Mr. Fidel Gonzalez' house to execute the warrant against him. However, Detective Quezada was only able to speak to Mrs. Gloria Gonzalez, Mr. Fidel Gonzalez's mother.   Tr. at 10-11.

6.    During the conversation between Detective Quezada and Mrs. Gonzalez, Mrs. Gonzalez consented to the search of her house.  Tr. at 12.

7.    Neither Detective Quezada nor the officers accompanying him ever showed Mrs. Gonzalez a warrant allowing them to search the property. Tr. at 91.

8.    Detective Quezada and the other officers were unable to find Mr. Fidel Gonzalez and proceeded to leave the premises. Tr. at 12-13.

9.    After leaving the premises, Detective Quezada decided to continue surveillance on Mr. Fidel Gonzalez' residence.  Tr. at 14.

10.    As Detective Quezada was surveilling Mr. Fidel Gonzalez' residence, he saw a person, wearing a white shirt, approaching the house under surveillance. Such person was Mr. Juan Pedro Payan-Vargas (Defendant) who is the brother-in-law of Mr. Fidel Gonzalez'. Tr. at 15, 17, 76-77.

11.    Defendant parked outside his house and entered Mr. Fidel Gonzalez' house through the front door, which is the only entrance to the house. Tr. At 69.

12.     Mr. Fidel Gonzalez' residence and Defendant's residence are located on the same lot. Both houses are connected by a walkway that is well lit by a floodlight. All the property is well lit by flood lights.   Moreover, the entrance to the house of Mr. Fidel Gonzalez is also lit by a floodlight. Tr. at 68, 85.

13.     At the time Detective Quezada saw Defendant, he called for backup. During his call, Detective Quezada saw another vehicle arriving at Mr. Fidel Gonzalez' house. A gentleman stepped-down from the vehicle and was talking to Defendant. Tr. at 16-17.

14.     Four to five officers arrived at the scene to help Detective Quezada and they all entered the property.  Tr. at 18.

15.     Neither Detective Quezada nor the officers accompanying him ever showed a warrant allowing them to search the property or requested permission to enter the property. Tr. at 91.

16.     When the officers entered the property, Defendant was walking towards the mobile home adjacent to Mr. Fidel Gonzalez' mobile home. Detective Quezada started following Defendant, however, Defendant kept walking away from him. Tr. at 20. It is important to point out that the record does not show Detective Quezada asking Defendant to stop walking.

17.     The other gentleman that had arrived at the property was never questioned about his identity. Tr. at 45.

18.     Detective Quezada was able to put himself in front of Defendant. At that time, he was able to see Defendant's physical characteristics. Tr. at 46.

19.     Defendant was surrounded by officers and was not free to leave the scene. Tr. at 87 and Tr. at 99.

20.     Detective Quezada questioned Defendant about his identity. Defendant gave Detective Quezada his name and date of birth. Detective Quezada proceeded to call Central Dispatch, which advised him that Defendant had an outstanding warrant as an alien who had been deported before. Tr. at 47.

21.     Detective Quezada called Border Patrol. Tr. at 47.

22.     A Border Patrol unit would take from 20 to 40 minutes to arrive at the scene. Tr. at 47-48.

23.     Detective Quezada was told by his supervisor to take Defendant to the Border Patrol station.  Tr. at 27.

24.     When Defendant was being taken to the Border Patrol station, Detective Quezada believed that Defendant was not Mr. Fidel Gonzalez. Tr. at 48-49, 51-52.

25.      Defendant was taken to the Border Patrol station because of his prior immigration violation. Tr. at 52.

26.     Detective Quezada had no authority to detain Defendant because he had not violated any state or local law. Tr. at 53.

27.    Detective Quezada had no authority to detain Defendant for immigration violations. Tr. at 53.

28.    Defendant is about 5'3", 5'4", weighs 150 to 160 pounds, and has never had any tattoos on his body. Tr. at 69.

29.    Mr. Fidel Gonzalez is 5'9", weighs 200 pounds, and has tattoos all over his body. Tr. at 74.

30.    Mr. Fidel Gonzalez is 35 years-old and has been constantly arrested by the Las Cruces Police Department since he was 18 years-old. Tr. at 73, 78. Some of these arrests have been made by Detective Quezada. Tr. at 76-78.

31.    Mr. Fidel Gonzalez has lived in Las Cruces for 34 to 35 years. Tr. at 80.

## PROPOSED CONCLUSIONS OF LAW

1.    Mr. Payan was seized, for Fourth Amendment purposes, when Detective Quezada made contact as Mr. Payan was returning to his home. Detective Quezada's actions of stopping Mr. Payan, preventing him from leaving the area or returning to his home, stating that Mr. Payan needed to walk with him, and then repeatedly questioning Mr. Payan about his identity was a seizure because, based on the totality of the circumstances, a reasonable person would not have felt free to leave from the moment the officers interfered with his movements and began to interrogate him. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

2.      The seizure was not a valid investigative detention under *Terry v. Ohio*, 392

U.S. 1 (1968), and *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) (holding that

Border Patrol agents may not perform roving stops in border areas absent reasonable

suspicion).   *Terry* and *Brignoni-Ponce* require that officers at the time of the stop have

specific, articulable facts which support reasonable suspicion that the suspect is engaged in

criminal behavior. *See Terry*, 392 U.S. at 21-22; *Brignoni-Ponce*, 422 U.S. at 884. Detective

Quezada's detention of Mr. Payan was in violation of Mr. Payan's Fourth Amendment rights

because he lacked a particularized, reasonable, and articulable suspicion that Mr. Payan was

engaged in any criminal activity. *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 293 (10th

Cir. 1996).   A stop or arrest based solely on the men's Hispanic appearance is

unconstitutional. *See Brignoni-Ponce*, 422 U.S. at 886-87 ("Hispanic appearance alone is

insufficient to justify a stop."). Furthermore, Detective Quezada is on the U.S. Marshal's

Fugitive Task Force and a member of the Las Cruces Police Department TNT Unit, which

do not have the authority to either execute immigration warrants, take immigration suspects

into custody or even transport them. Enforcement of immigration laws are exclusively vested

in the U.S. Citizen and Immigration Service, Customs and Border Protection, or Immigration

and Customs Enforcement.

3.      As a result of the seizure, agents obtained knowledge sufficient to bring the

charge against Mr. Payan for illegally entering the United States following deportation after

conviction of an aggravated felony.   They obtained statements of identity and obtained

6

information that matched those of a man subject of deported criminal of an aggravated felony, and confession that Mr. Payan was present in the United States without permission on the date in question. This information can be suppressed as "a fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963). Importantly, the fruits of the illegal seizure and search include not only any statements made by, but also the agents' knowledge of his presence and evidence derived or located based on comparison of identification data in his files with identification data obtained through the illegal arrest. *See, e.g., Davis v. Mississippi*, 394 U.S. 721 (1969) (suppressing fingerprints); *Hayes v. Florida*, 470 U.S. 811 (1985) (same); *United States v. Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001) (suppressing identifying information, including fingerprints, in illegal reentry case); *United States v. Ortiz-Hernandez*, 276 F.Supp.2d 1113 (D.Oregon 2003) (suppressing fingerprints obtained as the result of unlawful investigative detention and arrest in illegal reentry case). There can be no doubt in this case that the government would not have discovered any of the evidence necessary to charge Mr. Payan if not for the illegal seizure.

4.    Furthermore, any statements seized from Mr. Payan are suppressed because they were obtained in violation of his *Miranda* rights. *Miranda* provides that the prosecution may not use statements, obtained from custodial interrogation of a defendant unless the procedural safeguards are used to secure the privilege against self-incrimination. *Miranda, supra.* In this case, all questioning of Defendant was custodial and intended to elicit incriminating information, requiring suppression of the statements seized in violation of

7

*Miranda. See, e.g., United States v. Parra,* 2 F.3d 1058, 1068 (10th Cir. 1993) (INS agent's questioning of defendant about his true name to link defendant to his "incriminating immigration file" constituted improper interrogation); *United States v. Doe,* 878 F.2d 1546, 1551-52 (1st Cir. 1989) ("questions about citizenship, asked on the high seas, of a person present on a foreign vessel with drugs on board," constituted improper interrogation, since U.S. citizenship was an element of the offense); *United States v. Mata-Abundiz,* 717 F.2d 1277, 1280 (9th Cir. 1983) (alien arrested on gun charges was improperly interrogated by INS agent about his alien status); *United States v. Gonzales-Sandoval,* 894 F.2d 1043, 1046-47 (9th Cir. 1990) (statements elicited by Border Patrol agents about detainee's immigration status, place of birth, and aliases constituted improper interrogation).

5.     Accordingly, the Court concludes that Mr. Payan was stopped without reasonable suspicion or probable cause, and therefore all statements and fingerprints seized from him, as well as the immigration and criminal records located using that evidence of identity, cannot be used in the prosecution against him.

6.     "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment." *Davis,* 394 U.S. at 724. "Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof." *Id.* There is no exception in *Lopez-Mendoza* for statements of identity and associated evidence, nor is there a blanket exception for immigration records.

## PRAYER

WHEREFORE, Defendant respectfully prays that the Court adopt the foregoing proposed Findings of Fact and Conclusions of Law, and suppress all evidence obtained as a result of the Fourth Amendment violation. Defendant further prays that the Court set this motion for a hearing and enter an order granting the above-requested relief.

Respectfully submitted,


**FELIPE D.J. MILLAN**
Texas State Bar No. 00788791
New Mexico State Bar No. 7220
2630 Montana Avenue
El Paso, Texas   79903
Telephone:   (915) 566-9977
Facsimile:    (915) 562-6837

**ATTORNEY FOR DEFENDANT**


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was delivered to Mr. Norman Cairns , Assistant United States Attorney, Office of the United States Attorney, P.O. Box. 607, Albuquerque, NM, 87103, on this the ⎽⎽18th⎽⎽ day of October, 2005.


**FELIPE D.J. MILLAN**